1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   WILLIAM ALLEN GARRETT,                    Civil No.    11cv2540 IEG (WVG)
     CDCR #AM-6925,
12
                                  Plaintiff,   **ORDER GRANTING DEFENDANTS'**
13                                             **MOTION FOR SUMMARY**
                     vs.                       **JUDGMENT PURSUANT**
14                                             **TO FED.R.CIV.P. 56(c)**

15   ANDRES RUIZ; BRANDON JORDAN;              **[ECF Doc. No. 65)]**
     BRETT H. BURKETT; SAN DIEGO
16   POLICE DEPARTMENT,

17                                 Defendants.

18   **I.      Procedural Background**

19          Currently pending before the Court is a Motion for Summary Judgment or Partial

20   Summary Judgment filed by Andres Ruiz, Brandon Jordan, Brett Burkett and the City of San

21   Diego ("Defendants") pursuant to FED.R.CIV.P. 56.

22          Defendants seek judgment as a matter of law as to various claims made by William Allen

23   Garrett ("Plaintiff"), a state prisoner currently incarcerated at Salinas Valley State Prison, who

24   is proceeding in pro se with a Complaint filed against them pursuant to the Civil Rights Act, 42

25   U.S.C. § 1983.[1]

26   / / /

27   _____

28        [1] Plaintiff initiated this action in pro se, and while he was later represented by counsel, his
     counsel of record was permitted to withdraw on January 14, 2013 [ECF Doc. No. 73].

1  Plaintiff claims Defendants Ruiz and Jordan, both San Diego Police Officers, violated his

2  Fourth, Eighth and Fourteenth Amendment rights on July 14, 2011, by using unreasonable and

3  deadly force to effect his arrest during a commercial burglary.  (Compl. at 2-3.)  Plaintiff further

4  claims Defendant Burkett, a San Diego Police Detective, violated his Fifth and Fourteenth

5  Amendment right to due process when he "interrogated" Plaintiff in the hospital afterward while

6  he was under the influence of narcotic pain medications.  (*Id.* at 4.)  Finally, Plaintiff claims the

7  City of San Diego, which he has erroneously sued as the "San Diego Police Department,"

8  violated his Eighth Amendment rights by "failing to stop" its officers and "fail[ing] to protect

9  even [a] person committing a crime."  (*Id.* at 5.)  Plaintiff seeks $365,000 in general damages

10  and $2 million in punitive damages. (*Id.* at 7.)

11  Having carefully considered the record as submitted, the Court now GRANTS

12  Defendants' Motion for Summary Judgment pursuant to FED.R.CIV.P. 56(a) for the reasons set

13  forth below.

14  **II.     Factual Background**

15  Plaintiff was found guilty of burglary in violation of CAL. PENAL CODE § 459 and

16  receiving stolen property in violation of CAL. PENAL CODE § 496(a) by a San Diego Superior

17  Court jury in Case No. SCD235343 on March 5, 2012.   *See* Defs.' Ex. C.  The jury further

18  found Plaintiff personally used a knife in the commission and attempted commission of the

19  burglary, which provided for an enhanced sentence pursuant to CAL. PENAL CODE § 12022(b)(1)

20  and  § 1192.7(c)(23).  *Id.*

21  On July 14, 2011 at approximately 10:30 p.m., San Diego Police Officers Ruiz and Jordan

22  responded to a radio dispatch of a burglary in progress at a commercial office building located

23  at 3330 3rd Avenue in the Bankers Hill area of San Diego.  *See* Pl.'s Decl. in Opp'n to Summ.

24  J. [ECF Doc. No. 78] (hereafter "Pl.'s Decl.") at 17 ¶ 2; Defs.' Ex. A, Decl. of Andres Ruiz in

25  Supp. of Mot. for Summ. J. [ECF No. 65-3] (hereafter "Ruiz Decl.") at 3 ¶ 3.  Plaintiff admits

26  he "was burglarizing a dentist['s] office in the building."  Pl.'s Decl. ¶¶ 2.  Ruiz and his partner,

27  Jordan, were working as patrol officers and were dressed in full police uniform with badges

28  affixed at the time.  Ruiz Decl. ¶ 2.  Ruiz was aware that the person reporting the burglary was

in an office on the third floor, and had reported hearing the sound of glass breaking in the second.  *Id.* ¶ 3.

When they arrived at the scene, Ruiz and Jordan took an elevator from the street level to the second floor, while other officers took the stairs.  *Id.* ¶ 4; Pl.'s Decl. ¶ 2 at 18.  Plaintiff claims the second floor courtyard area outside the elevator was "very dark," and that "both officers had turned on their high-powered flashlights attached to the rails of their guns."  Pl.'s Decl. ¶ 2 at 18; Pl.'s Ex. F [ECF Doc. No. 78-2] at 16-18.  As the elevator doors opened, Officer Jordan testified that he "took a step out," and "scanned to [his] left" where he noticed a tree in a planter looked like it had been thrown throw a window.  *Id.* at 17.  Jordan testified Ruiz radioed to the other officers at the scene that they "had a valid window smash."  *Id.*; *see also* Pl.'s Decl. ¶ 2 at 18; Pl.'s Ex. D [ECF Doc. No. 78-2] at 10, 12.

"Within seconds" of exiting the elevator, Ruiz claims he and Jordan "feeling there was a burglary in progress, ... both drew [their] handguns," and "saw ... Plaintiff inside a dimly lit dentist office" to their left.  Ruiz Decl. ¶ 5.  They also saw a wall with broken glass "less than 10 feet away." *Id.*

Plaintiff alleges he "assumed [Ruiz and Jordan] were security guards," and "sprinted from the dentist office towards the exit sign he notice[d] when he was burglarizing the dentist['s] office."  Pl.'s Decl. ¶ 2 at 18.  Ruiz, however, claims he and Jordan were "confronted by ... Plaintiff," who "quickly stepped from the dentist office moving toward [them]," "ducking down underneath some office blinds," and "through the broken glass wall" at a "fast pace."  Ruiz Decl.¶¶ 6-7.  "As he came through the broken glass wall," Ruiz claims he "saw ... Plaintiff holding a large knife in his right hand with the blade held upwards," and "some other unrecognizable object in his left hand."  *Id.* ¶ 7.  "The knife appeared to measure over twelve inches long."  *Id.*; *see also* Defs.' Ex. A [ECF Doc. No. 65-3] at 7.  Ruiz claims he yelled, "Stop, Stop, Stop!" but Plaintiff "ignored [his] orders and continued to quickly step toward [them] with the knife" held in a "threatening" and "upright" manner, until he was "within less than 5 feet" from them.  Ruiz Decl. ¶ 8.  Ruiz claims due to "the position [from which Plaintiff] was holding the knife," Plaintiff's "failure to obey [Ruiz's] command to stop," and because Plaintiff was

1  "quickly stepping toward [them]," he "fear[ed] that [they] were about to be stabbed," "quickly

2  tool a step backwards toward the closed elevator area," and "rapidly pulled [his] handgun's

3  trigger three times." *Id.* ¶¶ 8-9.

4      Plaintiff, for his part, claims both Ruiz and Jordan were "shining high-powered

5  flashlight[s] at ... [him], tracking him as he attempted to flee the scene." Pl.'s Decl. ¶ 2 at 18.

6  Plaintiff claims "there was never an announcement that they were officers," *id.*, and in support,

7  points to Defendants' Exhibit D, an audio recording containing the sound of three rapid fire

8  gunshots, which he alleges was recorded on a "radio mike" which was "click[ed] open to

9  broadcast," at the time, but does not include any "announcement that [Ruiz and Jordan] were

10  officers." Pl.'s Decl. ¶ 2 at 18; Defs.' Ex. D.  Plaintiff also attaches portions of his trial

11  transcript, however, in which Ruiz testified that he recalled announcing "San Diego Police

12  Department" in a "loud" voice as he and Jordan stepped out of the elevator.  *See* Pl.'s Ex. D

13  [ECF Doc. No. 78-2] at 11.  Plaintiff also admits that Jordan "started shouting to get down, get

14  down," however, Ruiz was "firing his weapon, [and] tracking [him] in close proximity."  Pl.'s

15  Decl. at 18.

16      In what appears to be Officer's Jordan's witness statement to a reporting detective dated

17  July 19, 2011, a portion of which Plaintiff attaches to his Opposition as Exhibit F, Jordan

18  claimed that as he took a step off the elevator, Officer Ruiz was to his right and "slightly ahead

19  of him."  *See* Pl.'s Ex. F [ECF Doc. No. 78-2] at 16.  As Ruiz was "putting out that [they] had

20  a valid window smash, ... [Jordan] saw [Plaintiff] running out toward [them]" at "full speed"

21  from a distance of "no more than ten feet from the broken window."  *Id.* at 16, 21.  Jordan

22  testified he had his gun and light pointing directly at Plaintiff, but that he did not comply with

23  a command to get down in the ground.  *Id.* at 22, 23.  Jordan then "broke [his] shooting grip,"

24  and "pull[ed] [his] firearm back," in order to "go hands on" because Plaintiff "was about to run

25  over [them]" when Ruiz "fired three shots."  *Id.* at 22.  Jordan admitted to investigators that he

26  could not see Plaintiff's hands, or any weapon in his hands, until *after* Ruiz fired his weapon,

27  Plaintiff fell to the ground, and Ruiz kicked the knife out away from him.  *Id.* at 16, 22.

28  / / /

Plaintiff admits he was holding a knife, but claims he "attempted to toss the knife back into the dentist['s] office," when "a shot fired went through his wrist holding the knife." Plaintiff also admits his response was to "tr[y] to run faster." Pl.'s Decl. at 18. Plaintiff claims Ruiz's "next shot ... went through the dentist['s] office, but the third shot ... struck [him] behind the right ear ... travel[ed] down [the] right side of [his] neck and c[ame] to rest at the center of [his] chest next to his heart." Pl.'s Decl. ¶ 2 at 18.

Ruiz admits he fired three shots at Plaintiff in rapid succession within one to two seconds. Ruiz Decl. ¶ 11. Ruiz claims "after [he] shot ... Plaintiff[,] he fell to the ground and dropped the knife." Id. ¶ 12. Plaintiff claims that once he was on the ground, Ruiz turned him over, and it was only then he "recognized that [Ruiz and Jordan] were not security guards." Pl.'s Decl. ¶ 2 at 19; *see also* Pl.'s Ex. C [ECF Doc. No. 78-2] at 5-6.

Plaintiff admits he was holding a knife when he was shot, but swears "there was no threat to [the] officers," that he "was running away," at the time Ruiz fired his weapon, and that therefore, "the use of deadly force was unreasonable." Pl.'s Decl. ¶ 2 at 18-19.

During his hospitalization after the shooting, Plaintiff alleges Detective Burkett "interrogated" him while he was "under morphine and percadates [sic]" in violation of his "5th and 14th Amendment right to due process." Compl. at 4. Plaintiff alleges Burkett "suggested [he] was suicidal," and "convinced" Plaintiff that he was. *Id.* Plaintiff does not describe any statements he made to Burkett, nor does he explain or point to any evidence in the record to show whether any statements he made were introduced against during his trial.

Defendants, however, ask the Court to take judicial notice of a "402 hearing" held on February 22, 2012, in Plaintiff's criminal proceedings before San Diego Superior Court Judge Gale Kaneshiro in San Diego Superior Court Case No. SCD235343. *See* Defs.' Ex. B [ECF No. 65-4]. At this pretrial hearing, during which Plaintiff was present and represented by his public defender, Detective Burkett testified that he questioned Plaintiff on July 18, 2011, for approximately 15 minutes, beginning at 8:45 a.m. in his hospital room at Scripps Mercy Hospital. *Id.* at 5. Burkett testified that while Plaintiff was in a hospital bed, and "had various items of medical intervention," like IV tubes in him, Plaintiff appeared to comprehend the

questions he was asked, was able to identify some items of clothing, and "for the most part" "stayed on topic." *Id.* at 7.  Burkett testified that he recited the *Miranda* warnings "from memory" and when he asked Plaintiff if he understood, Plaintiff replied "Yes, sir." *Id.* at 8. When Burkett further asked if Plaintiff wished to waive his rights and speak, Burkett testified Plaintiff replied, "Might as well.  It doesn't matter." *Id.* at 8, 16-17.

Burkett testified that Plaintiff went on to answer his questions, and at no time seemed unable to understand, "asked for an attorney," or sought to end the interview. *Id.* at 7-8.  Burkett remembered that he thought Plaintiff had a tube in his neck at the time, but never complained of pain. *Id.* at 11.  Burkett also "assumed" Plaintiff was "under ... some type of medication," and "said that to him," but they "continued to talk," and Plaintiff made no further comments about medication. *Id.* at 11, 18.

After hearing this testimony, and argument from both the district attorney and Plaintiff's defense counsel, Judge Kaneshiro found that under the "totality of the circumstances," Plaintiff "understood his rights," and that while Plaintiff may have been taking pain medication at the time, his *Miranda* waiver was "unequivocal" and there was no showing that his "ability to comprehend or know what's going on," was so compromised as to render his statements involuntary. *Id.* at 21-22.  Therefore, Plaintiff's statements to Burkett were ruled admissible. *Id.*

Finally, Plaintiff claims the San Diego Police Department "should have reasonably known" that "the officers [i]nvolved in this civil action engaged in ... numerous constitutional violations that caused [him] physical and life[-]altering emotional scars," and that its "failure to stop these violations," amounted to an Eighth Amendment violation.  Compl. at 5.

Plaintiff seeks $365,000 in general damages and "2 million" in punitive damages pursuant to 42 U.S.C. § 1983. *Id.* at 7.

## III.   Defendants' Motion

Defendants seek "full or partial summary judgment" on grounds that: 1) "Plaintiff's claims are barred by *Heck v. Humphrey*," [512 U.S. 477 (1994)], *see* Defs.' P&As in Supp. of Mot. for Summ. J. [ECF Doc. No. 65-1] (hereafter "Defs. P&As") at 9-11; 2) "qualified

immunity applies to [Plaintiff's] arrest," *id.* at 11-13; 3) the force used in effecting Plaintiff's arrest was "objectively reasonable as a matter of law," *id.* at 13-15; and 4) "there is no evidence to support a *Monell* [*v. Dep't of Social Servs.*, 436 U.S. 658 (1977] claim against the City." (*Id.* at 15-16.)

On January 15, 2013, the Court provided Plaintiff with notice of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc) [ECF Doc. No. 74]. Plaintiff has since filed a Response in Opposition, [ECF Doc. 78] as well as a Request for Judicial Notice [ECF Doc. No. 79]. On March 11, 2013, Defendants filed a Reply [ECF Doc. No. 88].

## A.    FED.R.CIV.P. 56 Standard of Review

Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (quoting FED.R.CIV.P. 56(a)); *see also Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED.R.CIV.P. 56(c)); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Bias*, 508 F.3d at 1218. To avoid summary judgment, the non-moving party is "required to present significant, probative evidence tending to support h[is] allegations,"

1    *Bias*, 508 F.3d at 1218 (citations omitted), and must point to some evidence in the record that

2    demonstrates "a genuine issue of material fact [which], with all reasonable inferences made in

3    the plaintiff['s] favor, could convince a reasonable jury to find for the plaintiff[]." *Reese v.*

4    *Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing FED.R.CIV.P. 56;

5    *Celotex*, 477 U.S. at 323). "The substantive law determines which facts are material; only

6    disputes over facts that might affect the outcome of the suit under the governing law properly

7    preclude the entry of summary judgment." *Nat'l Ass'n of Optometrists*, 682 F.3d at 1147 (citing

8    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party cannot rest

9    solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir.

10   1986). Instead, to demonstrate a genuine issue requiring trial, the opposing party "must do more

11   than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*,

12   475 U.S. at 587 (citation omitted).

13        The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All

14   reasonable inferences that may be drawn from the facts placed before the court must be drawn

15   in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are

16   not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate

17   from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp.

18   1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

19        The Court also notes it "does not have a duty to search for evidence that would create a

20   factual dispute." *Bias*, 508 F.3d at 1219 (citing *Carmen v. Unified School Dist.*, 237 F.3d 1026,

21   1031 (9th Cir. 2001)). In *Carmen*, the Ninth Circuit found it "unfair" to the require the district

22   court to "examine the entire file for evidence establishing a genuine issue of fact, where the

23   evidence is not set forth in the moving papers with adequate references so that it could be

24   conveniently found." *Id.*; *see also Forsberg v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417-

25   18 (9th Cir. 1988) (district court is "not required to comb the record to find some reason to deny

26   a motion for summary judgment"). This is true even where the non-moving party is proceeding

27   in pro se. *See Bias*, 508 F.3d at 1219 (affirming summary judgment for defendants where pro

28   so plaintiff "failed to present any evidence in opposition" and expressly rejecting pro se litigant's

1   argument that the district court "should have searched the entire record to discover whether there

2   was any evidence [to] support[] her claims" because she was proceeding without counsel).  "A

3   district court lacks the power to act as a party's lawyer, even for pro se litigants."  *Bias*, 508 F.3d

4   at 1219.

5        **B.**    **Whether *Heck* bars any of Plaintiff's claims**

6        Defendants first argue Plaintiff may not use this § 1983 action as a collateral attack on

7   the validity of his criminal conviction, and that to the extent he "alludes to a claim of lack of

8   probable cause for his arrest," claims "the charges against [him] were excessive," or argues that

9   Defendant Burkett violated his Fifth or Fourteenth Amendment rights by questioning him while

10   he was medicated, summary judgment should be granted because he has not and cannot show

11   that his conviction has been reversed, set aside, or otherwise invalidated. (Defs.' P&As at 9-11.)

12        In his Opposition, Plaintiff insists his suit is not an "attack" on his conviction, and that

13   he is *not* asserting claims of wrongful arrest or false imprisonment. (Pl.'s Opp'n at 10.)  Instead,

14   Plaintiff claims he has "admitted his guilt of commercial burglary," and that at trial, he

15   contested, and was found *not* guilty on a charge of assault with a deadly weapon on the officers.

16   (*Id*. at 7.)  Therefore, Plaintiff contends his excessive force claims are not *Heck* barred, and his

17   Opposition makes clear that his § 1983 suit challenges the *amount* of force Ruiz and Jordan

18   employed in effecting his arrest,[2] and not the validity of his conviction for burglary or receiving

19   stolen property.

20        *Heck* precludes a 42 U.S.C. § 1983 claim based on actions which would "render a

21   conviction or sentence invalid" where that conviction has not been reversed, expunged, or called

22   into question by issuance of a writ of habeas corpus. *Heck*, 512 U.S. at 486-87. "Consequently,

23   _____

24       [2]  The Supreme Court made clear in *Graham v. Connor*, 490 U.S. 386 (1989), that § 1983
     excessive force claims arising during arrest, both for deadly and non-deadly force, are to be analyzed

25   under the Fourth Amendment's reasonableness standards. *Id*. at 395-96. Thus, while Plaintiff invokes
     the Eighth Amendment in reference to his excessive force claims (Compl. at 3), "the Eighth

26   Amendment's prohibition against the malicious or sadistic use of force, *see Hudson v. McMillian*, 503
     U.S. 1 (1992), does not apply 'until after conviction and sentence,' *Graham*, 490 U.S. at 392 n.6."

27   *Pierce v. Multnomah Co.*, 76 F.3d 1032, 1042 (9th Cir. 1996) (citing *Ingraham v. Wright*, 430 U.S. 651,
     671 n.40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the
     constitutional guarantees traditionally associated with criminal prosecutions.").  Because Plaintiff was

28   not convicted or sentenced at the time his excessive force claims arose, the Fourth Amendment governs
     the constitutional analysis of his claims.

1    the relevant question is whether success in a subsequent 1983 suit would 'necessarily imply' or

2    'demonstrate' the invalidity of the earlier conviction or sentence[.]" *Beets v. County of Los*

3    *Angeles*, 669 F.3d 1038, 1042 (9th Cir. 2011) (quoting *Heck*, 512 U.S. at 487).

4          *Heck* bars a § 1983 action if it necessarily implies the invalidity of an underlying

5    conviction, but it does not bar *all* § 1983 claims that may arise during the course of a state

6    criminal proceeding.  *Muhammed v. Close*, 540 U.S. 749, 751 (2004) ("*Heck*'s requirement to

7    resort to state litigation and federal habeas before § 1983 is not ... implicated by a prisoner's

8    challenge that threatens no consequence for his conviction or the duration of his sentence.").

9    Specifically, the Ninth Circuit has held allegations of excessive force by a police officer are not

10   barred by *Heck* if they are distinct temporally or spatially from the factual basis for the person's

11   conviction.  *Beets*, 669 F.3d 1038, 1042 (citing *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th

12   Cir. 2005) (en banc)).  The critical element remains whether Plaintiff's action, if successful, will

13   "demonstrate the invalidity of any outstanding criminal judgment." *Id.* at 1043 (citing *Heck*, 512

14   U.S. at 486-87).

15         Here, if Plaintiff *were* claiming that Officer Ruiz and Jordan lacked probable cause to

16   arrest him, or that he was over-charged as the result of an constitutionally tainted criminal

17   investigation and prosecution, *Heck*'s "favorable termination" rule would clearly apply to bar

18   his suit.  *See Heck*, 512 U.S. at 484 ("[T]o permit a convicted criminal defendant to proceed with

19   a malicious prosecution claim [under §1983] would permit a collateral attack on the conviction

20   through the vehicle of a civil suit."); *see also Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir.

21   2006) (finding "wrongful arrest, malicious prosecution, and a conspiracy among Los Angeles

22   officials to bring false charges" barred by *Heck*).

23         Plaintiff's excessive force claims are *not Heck*-barred however, because these claims, if

24   successful, would not "demonstrate the invalidity of [his or] any outstanding criminal judgment."

25   *Beets*, 669 F.3d at 1043.  Plaintiff was convicted of burglary and possession of stolen property;

26   two charges which are "temporally," "spatially" and factually distinct from his allegations of

27   excessive force by his arresting officers.  *Id.* at 1042; *City of Hemet*, 394 F.3d at 695, 699.

28   Plaintiff was found *not guilty* of two counts of assault with a deadly weapon on a peace

1   officer–the only conviction which could potentially bar a suit for damages based on claims of

2   excessive force.  *See* Defs.' P&As at 9 & Defs.' Ex. C.  In fact, in *Guerrero*, the only case cited

3   by Defendants in support of their *Heck* argument, the Ninth Circuit held that *Heck* did <u>not</u> bar

4   Guerrero's § 1983 excessive force claim, because "[t]he officers' alleged use of excessive force

5   during Guerrero's arrest d[id] not preclude the possibility that Guerrero was still guilty of

6   possession of narcotics."  442 F.3d at 703.

7        The same is true here:  Plaintiff's claims that Ruiz and Jordan used unreasonable force

8   in effecting his arrest do not preclude the possibility that he was still guilty of burglary or

9   receiving stolen property.  *See also Beets*, 669 F.3d at 1038; *Estate of Srabian v. County of*

10  *Fresno*, 2012 WL 5932938 at *9 (E.D. Cal. 2012) (unpub.) (finding claim of excessive deadly

11  force would not necessarily "demonstrate the invalidity of" the decedent's conviction for

12  exhibiting or brandishing a firearm).  Thus, to the extent Defendants seek summary adjudication

13  as to Plaintiff's excessive force claims against Officers Ruiz and Jordan on *Heck* grounds, their

14  Motion is DENIED.

15       To the extent Plaintiff alleges a "Fifth Amendment" or "Due Process" violation against

16  Defendant Burkett based on his questioning during Plaintiff's hospitalization (Compl. at 4),[3]

17  Defendants also argue this claim is *Heck* barred, but again without any discussion whatsoever

18  as to how or why an award of damages as to these claims would "necessarily imply" or

19  "demonstrate" the invalidity of his conviction for burglary or receiving stolen property.  *Heck*,

20  512 U.S. at 487.  In fact, Defendants have not described the content or provided a transcript of

21  any statements made by Plaintiff, nor have they explained the context in which they were

22  introduced during his trial.  (*See* Defs.' P&As at 10.)  Without pointing to any case law, let alone

23  any evidence in the record, the Court finds Defendant Burkett has also not carried his burden to

24  show he is entitled to a summary adjudication as to Plaintiff's Fifth and Fourteenth Amendment

25  claims against him on *Heck* grounds.  *See Celotex*, 477 U.S. at 323 (on summary judgment, the

26  _____

27       [3]  No person "shall be compelled in any criminal case to be a witness against himself."  U.S.
     CONST. amend V.  The self–incrimination Clause of the Fifth Amendment is applicable to the States

28  through the Due Process Clause of the Fourteenth Amendment.  *Chavez v. Martinez*, 538 U.S. 760, 789-
     90 (2003) (citing *Malloy v. Hogan*, 378 U.S. 1, 6 (1964); *Griffin v. California*, 380 U.S. 609, 615
     (1965)).

11cv2540 IEG (WVG)

moving party must identify the elements of the claim in the pleadings, or other evidence, which it "believes demonstrates the absence of a genuine issue of material fact.").

However, Defendant Burkett further argues Plaintiff is "precluded from re-litigating" the introduction of any statements Plaintiff made because the "criminal trial court ruled against [him], finding [his] Fifth Amendment waiver was knowing[] and voluntar[y]." Defs.' P&As at 10. This time in support of their argument, Defendants provide a Reporter's Transcript of a hearing before San Diego Superior Court Judge Gale E. Kaneshiro on February 22, 2012, regarding the admissibility (but not the content) of statements Plaintiff made to Defendant Burkett while he was recuperating from surgery at Scripps Mercy Hospital four days after the shooting. *See* Defs.' Ex. B [ECF Doc. No. 65-4]. During the hearing, Judge Kaneshiro heard testimony from Defendant Burkett both on direct and as cross-examined by Plaintiff's defense counsel, regarding whether Burkett provided Plaintiff with proper *Miranda* warnings, and whether Plaintiff knowingly and voluntarily waived his Fifth Amendment right to remain silent. At the end of this testimony, and after hearing argument from both the prosecution and the defense, Judge Kaneshiro ruled that "it appears [Plaintiff] understood his rights" and "was willing to speak with the officer," and that "any statement made by Mr. Garrett to Officer Burkett" was "voluntary" "under the totality of the circumstances" and therefore admissible at trial. *Id.* at 19-20.

The Ninth Circuit follows state rules of issue preclusion. *Ayers v. City of Richmond*, 895 F.2d 1267, 1270 (9th Cir. 1990). Under California law, collateral estoppel "prevents a party who had a full and fair opportunity to litigate a particular issue in a prior proceeding from re-litigating it in a subsequent proceeding." *McCutchen v. City of Montclair*, 73 Cal.App.4th 1138, 1144, 87 Cal.Rptr.2d 95 (1999). It is specifically settled that a judgment of conviction in a criminal case may collaterally estop the defendant from re-litigating in a subsequent civil action an issue necessarily decided in the criminal case. *Allstate Ins. Co. v. Overton*, 206 Cal.Rptr. 823, 160 Cal.App.3d 843 (1984). The prerequisites for such collateral estoppel are: "(1) a final judgment on the merits in the first action, (2) identity or privity among the parties in the first action and those against whom the estoppel is asserted, and (3) identity of the issue presented

1  in the second action with one necessarily decided in the first." *Id.* at 826, 160 Cal.App.3d at

2  847. However, if the prior criminal action did not necessarily decide the very issue disputed in

3  the second suit, collateral estoppel does not apply. *Id.*

4      Here, Defendants argue Plaintiff is estopped from re-litigating the validity of his hospital

5  interrogation by Defendant Burkett because the same issues were raised and decided during

6  Judge Kaneshiro's 403 hearing held just prior to his trial on February 22, 2012 (Defs.'s Ex. B),

7  and the trial resulted in a "final judgment" against him–a conviction entered on March 5, 2012.

8  *See* Defs.' Ex. C.  Moreover, Plaintiff was represented by counsel at the time, faced several

9  serious felony charges and was therefore "motivated to fully litigate" his Fifth Amendment

10  claims, and as the sole defendant was unquestionably a party to his own state criminal

11  prosecution. *See Ayers*, 895 F.2d at 1271 (applying California's factors for collateral estoppel

12  to preclude plaintiff's re-litigation in a subsequent § 1983 case of a Fourth Amendment

13  suppression issue decided against him during a CAL. PENAL CODE § 1538.5 hearing prior to his

14  criminal trial); *see also Beets*, 669 F.3d at 1047-49.

15      For these reasons, the Court GRANTS Defendant Burkett's Motion for Summary

16  Judgment as to Plaintiff's Fifth and Fourteenth Amendment claims.[4]

17      **C.    Whether Defendants Ruiz and Jordan are entitled to qualified immunity as**
           **to Plaintiff's excessive force claims**
18

19      Defendants further claim that to the extent Plaintiff's "allegations [in] Count 1 [of his

20  Complaint] could be said to allude to a claim of excessive force under the Fourth Amendment,"

21  they are entitled to judgment as a matter of law on grounds of qualified immunity.  Defs.' P&As

22  at 13, 15.

23      Qualified immunity protects government officials "from liability for civil damages insofar

24  as their conduct does not violate clearly established statutory or constitutional rights of which

25  ────────────────

26      [4] Even if Plaintiff's claims against Defendant Burkett were not collaterally estopped, the Court
    notes that a plaintiff may not, as a matter of law, maintain a section 1983 action based merely upon a
    failure by police to issue *Miranda* warnings.  *See Cooper v. Dupnik*, 924 F.2d 1520, 1527 (9th Cir.
27  1991) (citing *Bennett v. Passic*, 545 F.2d 1260, 1263 (10th Cir. 1976) ("The *Miranda* decision does not
    even suggest that police officers who fail to advise an arrested person of his rights are subject to civil
28  liability; it requires, at most, only that any confession made in the absence of such advice of rights be
    excluded from evidence.").

a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Moreover, the protection of qualified immunity applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)); *see also Butz v. Economou*, 438 U.S. 478, 507 (1978) (qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law").

Qualified immunity provides "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). And, in a case like this one, qualified immunity may operate "to protect officers from the sometimes 'hazy border between excessive and acceptable force.'" *Saucier v. Katz*, 533 U.S. 194, 201, 206 (2001), *abrogated in part on other grounds by Pearson*, 555 U.S. at 236.[5] Thus, a public official's shield of qualified immunity is lost only if a plaintiff can establish both that (1) the officer's conduct violated a constitutional right, and (2) the right was "clearly established" at the time of the defendant's alleged misconduct. *Id.* at 201. "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 534 U.S. 194, 199 (2004) (internal citations omitted).

Defendants argue that "reasonable officers could make the same conclusions" under the totality of the circumstances presented to Officers Ruiz and Jordan that the use of "deadly force" was "objectively reasonable as a matter of law." Defs.' P&A's at 13-15. Plaintiff claims only that because he was "fleeing the scene" and attempting to toss the knife he admits he was

/ / /

---

[5] *Pearson* modified *Saucier* only to the extent it gives the court discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

1  holding when confronted by the officers, he posed "no threat," and the "use of deadly force" was

2  therefore, "unreasonable."  Pl.'s Decl. ¶ 2 at 18, 19.

3       As noted above, excessive force claims are analyzed under the Fourth Amendment

4  "reasonableness" standard.  *Graham*, 490 U.S. at 396.  Deciding whether an officer's use of

5  force was reasonable requires the Court to balance "the nature and quality of the intrusion on the

6  individual's Fourth Amendment interests against the countervailing governmental interests at

7  stake."  *Id.* (internal quotation marks omitted).  This determination "requires careful attention

8  to the facts and circumstances of each particular case, including the severity of the crime at issue,

9  whether the suspect poses an immediate threat to the safety of the officers or others, and whether

10  he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citing *Tennessee v.*

11  *Garner*, 471 U.S. 1, 8–9 (1985)).  "These factors, however, are not exclusive," and the court

12  must "examine the totality of the circumstances ... whether or not listed in *Graham*."  *Glenn v.*

13  *Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).  Thus, other factors

14  found relevant in the reasonableness determination include "the availability of less intrusive

15  alternative to the force employed, whether proper warnings were given and whether it should

16  have been apparent to the officers that the person they used force against was emotionally

17  disturbed."  *Id.*

18       The final inquiry is "whether the officer's actions are 'objectively reasonable' in light of

19  the facts and circumstances confronting them, without regard to their underlying intent or

20  motivation."  *Graham*, 490 U.S. at 397.  "The reasonableness of a particular use of force must

21  be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

22  vision of hindsight."  *Id.* at 396.  "The calculus of reasonableness must embody allowance for

23  the fact that police officers are often forced to make split-second judgments—in circumstances

24  that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in

25  a particular situation."  *Id.* at 396–97.

26       In sum, there is not "a magical on/off switch that triggers rigid preconditions" for the use

27  of deadly force, *Scott v. Harris*, 550 U.S. 372, 382 (2007), and while "reasonableness" is

28  oftentimes a question of fact for the jury, the officer may still be entitled to summary judgment

"if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Indeed, the Court finds that in this case, even assuming all facts in the record in Plaintiff's favor, no genuine issues of material fact exist to show that Ruiz and Jordan used unreasonable or unnecessary force under the circumstances.

First, the Court finds the severity of Plaintiff's crime, the burglary of a dentist office at night in a residential neighborhood, and the fact that he was further found to have personally using a knife in the commission of that burglary, weighs heavily favor of Defendants. *See* Def.'s Ex. C. Burglary is a serious felony in California. *See Lopez-Cardona v. Holder*, 662 F.3d 1110, 1112 (9th Cir. 2011) (burglary under California Penal Code § 459 constitutes a crime of violence because it is a felony "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."). The government has an undeniable, legitimate interest in apprehending criminal suspects and that interest is even stronger when the criminal is suspected of a felony. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003); *Coles v. Eagle*, 704 F.3d 624, 628-29 (9th Cir. 2012) (noting stolen car was "felony grade offense," which factored in favor of defendant officers); *cf. Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057-58 (9th Cir. 2003) (finding "little or no need to use any further physical force" where there was no underlying crime at issue–a neighbor called police because the plaintiff was acting in an emotionally disturbed manner).

Second, while *Garner* specifically holds that "[w]here [a] suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force," and that "[i]t is not better that all felony suspects die than that they escape." 471 U.S. at 11. However, ample evidence in the record shows that Plaintiff clearly posed an immediate and deadly threat to both Officer Ruiz and Jordan when he admits, after having shattered the glass of a dentist office in an enclosed and dark courtyard area no more than 5-10 feet from the Defendants, and while still carrying the "knife, [he] used as a / / /

16

burglar's tool," Compl. at 3, that he "sprinted from the dentist['s] office," in an "attempt to flee the scene." Pl.'s Decl. ¶ 2 at 18; Ruiz Decl. ¶¶ 5-7.

"[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11-12. The immediacy of the threat posed by the plaintiff, is in fact, the "most important" factor governing the reasonableness of the officers' response. *Glenn*, 673 F.3d at 872; *see also Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) ("*[I]mmediate* threat to the safety of the officers or others is "the most important single" element of the *Graham* factors) (emphasis original). Here, Plaintiff claims he was "attempting to toss the knife back into the dentist['s] office," Pl.'s Decl. ¶ 2 at 18, and therefore "there was no threat to the officers," *id.*, however, Defendant Ruiz and Jordan's response "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Plaintiff points to no evidence in the record to show how or why Ruiz and Jordan, or a reasonable officer in their position, would have any reason to believe that he was *not* dangerous, or that he had no intention of using the knife he held. *Id.* at 396 (court must adopt "the perspective of a reasonable officer on the scene ... in light of the facts and circumstances confronting him."); *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (noting that where an officer's use of force is based on a mistake of fact, the court must consider "whether a reasonable officer would have or *should* have accurately perceived that fact.").

Indeed, a suspect need not even *be* armed to "pose an immediate threat to the officers or others at the time of the shooting." *Forrett v. Richardson*, 112 F.3d 416, 420 (9th Cir. 1997), *overruled on other grounds by Chroma Lighting v. GTE Prods. Corp.*, 127 F.3d 11336 (9th Cir. 1997). However, it is "especially important" if the suspect *is* armed, as Plaintiff admits he was at the time Ruiz fired his weapon three times in rapid succession. *Glenn*, 673 F.3d at 872 (knife); *Blanford v. Sacramento Co.*, 406 F.3d 1110, 1115 (9th Cir. 2005) (sword); *see also Long*, 511 F.3d at 906 (finding it "immaterial" whether the plaintiff "actually fired his rifle.").

/ / /

1    Moreover, even if at the time Ruiz and Jordan exited the elevator Plaintiff was "sprinting

2    ... toward the exit sign," Pl.'s Decl. ¶ 2 at 18, and not "toward" the officers, Ruiz Decl. ¶¶ 6-7,

3    Plaintiff still admits he was holding a knife in his hand at the time, and Ruiz was aware that the

4    person who had reported the burglary was still inside the building. *Id.* ¶ 3. *See Brosseau*, 543

5    U.S. at 200 (noting "no Fourth Amendment violation" in cases involving officers who "shot a

6    fleeing suspect who presented a risk to others."); *Forrett*, 112 F.3d at 420 (noting public's

7    interest in preventing dangerous individuals from escaping into the community) (citation

8    omitted).

9    In addition, Plaintiff has failed to point to any evidence in the record to rebut the

10   testimony of Defendants' expert, Glenn N. Wagner, D.O., a County Medical Examiner who

11   testified at Plaintiff's trial. *See* Defs.' Ex. E in Supp. of Mot. for Summ J. [ECF Doc. No. 65-7]

12   (hereafter "Wagner Decl."). Wagner testified, after examining the medical record and related

13   evidence in Plaintiff's case, that the gunshot wound to his right posterior neck and his chest x-

14   ray, which showed a bullet fragment in his "left lung hilum and a left apical pneumothorax,"

15   were "consistent with a downward trajectory." *Id.* ¶¶ 3, 4. Wagner has testified that this medical

16   evidence shows the bullet which entered Plaintiff's neck "had a steep downward direction going

17   from right to left consistent with [Plaintiff] facing the officers and lunging forward in a head

18   down attitude." *Id.* ¶ 4.

19   In his Opposition, Plaintiff refers to other evidence which was introduced during his trial

20   which he claims contradicts Wagner's testimony. *See* Pl.'s Opp'n [ECF Doc. No. 78] at 9.

21   However, Plaintiff has not proffered any of that evidence in this case, nor has pointed to any

22   "particular parts of materials in the record, including depositions, documents, electronically

23   stored information, affidavits or declarations, stipulations, ... admissions, interrogatory answers,

24   or other materials," as he must pursuant to FED.R.CIV.P. 56(c)(1)(A), in order to show a

25   genuinely disputed material fact as to this issue. *See Angel v. Seattle-First Nat'l Bank*, 653 F.2d

26   1293, 1299 (9th Cir. 1981) ("A motion for summary judgment cannot be defeated by mere

27   conclusory allegations unsupported by factual data."); FED.R.CIV.P. 56(e) ("If a party fails to

28   properly support an assertion of fact or fails to properly address another party's assertion of fact

1   as required by Rule 56(c), the court may: ... (2) consider the fact undisputed for purposes of the

2   motion.").

3        Thus, because Plaintiff admits he was armed and further admits he was actively resisting

4   or attempting to evade arrest by flight at the time Ruiz discharged his weapon, the Court finds

5   this "most important" *Graham* factor also weighs heavily in favor of Defendants. *Glenn*, 673

6   F.3d at 872.

7        Third, while the potential for "less drastic alternatives" to deadly force is also a

8   consideration in deciding the objective reasonableness of the officer's actions, *see Forrett*, 112

9   F.3d at 420; *Glenn*, 673 F.3d at 872, the Fourth Amendment "does not require law enforcement

10  officers to exhaust every alternative before using justifiable deadly force," especially where the

11  exigency of the circumstances at the time do not allow for contemplation or consultation.

12  *Forrett*, 112 F.3d at 420; *Scott*, 39 F.3d at 915 ("requiring officers to find and choose the least

13  intrusive alternative would require them to use superhuman [as opposed to reasonable]

14  judgment," and "would entangle the courts in endless second-guessing of police decisions made

15  under stress and subject to the exigencies of the moment."); *cf. Doerle v. Rutherford*, 272 F.3d

16  1272, 1283-84 (9th Cir. 2001) (distinguishing "lone police officer suddenly confronted by a

17  dangerous armed felon threatening immediate violence," from an "erratic" and "agitated"

18  individual who was "verbally abusive, [but] physically compliant," "roaming" his own property,

19  "had not assaulted anyone" and was "charged only with the relatively minor crime of obstructing

20  the police in their efforts to subdue him.").

21       In this case, no evidence suggests that Officer Ruiz had any time or reason to consider

22  whether less drastic alternatives existed since "within seconds of exiting the elevator," he and

23  Jordan were "quickly" "confronted" by Plaintiff, who was "moving toward [them] at a fast

24  pace," and "holding a large knife in his right hand." Ruiz Decl. ¶ 7. And while Officer Jordan's

25  statements to investigators after the incident indicate he "didn't fire [his] weapon," and instead

26  began to "advance toward[] [Plaintiff] to take him to the ground," Jordan also attributes this to

27  the fact that Ruiz was "two steps ahead" of him he "didn't see" Plaintiff's hands, or that Plaintiff

28  "was armed" until after he fell to the ground and Ruiz kicked the knife away from his reach.

1   *See* Pl.'s Ex. F at 16, 22-23.   Because the evidence in the record shows the circumstances

2   presented to both officers required then to make a "split-second judgment" in "tense, uncertain,

3   and rapidly evolving" conditions,   *Graham*, 490 U.S. at 396-97, the Court finds that

4   consideration of "less drastic alternatives" were not necessary or even reasonably practical under

5   the circumstances.  *See Forrett*, 112 F.3d at 420 (noting that alternatives "must be reasonably

6   likely to lead to apprehension before the suspect can cause further harm.").

7          Finally, the Court finds evidence in the record, proffered by both Defendants and Plaintiff

8   himself, which shows that either Jordan and/or Ruiz gave Plaintiff some warning, albeit

9   unavailing, to either "Stop!" or "Get down! Get down!" before he was shot.  *See* Ruiz Decl. ¶ 8;

10  Pl.'s Decl. ¶ 2 at 18.  Per *Garner*, warnings "where feasible," 471 U.S. at 11-12, are a factor in

11  determining reasonableness, *Glenn*, 673 F.3d at 872, just as are the plaintiff's failure to heed

12  them. *Blanford*, 406 F.3d at 1116, 1117, 1119.  Here, Ruiz claims Plaintiff "ignored [his] orders

13  and continued to quickly step toward [them] with the knife held in a threatening manner" at a

14  distance of "less than 5 feet."  Ruiz Decl. ¶ 8.  Plaintiff, for his part, claims Ruiz simultaneously

15  or immediately began "firing his weapon,"  Pl.'s Decl. ¶ 2 at 18, thus suggesting that Plaintiff

16  had no chance to comply.  However, Plaintiff also admits that once Ruiz's first shot "went

17  through his wrist [which was] holding the knife," Pl.'s Decl. ¶ 2 at 18, he did not comply with

18  any commands, and instead "tried to run faster."  *Id.*  Based on this record, the Court finds the

19  Defendants' warnings weigh neither in their favor nor against them.  *See Blanford*, 406 F.3d at

20  1118 (finding no "objective unreasonableness" when officer did not stop firing when the plaintiff

21  "did not stop moving of holding [a] sword.").

22          Thus, based on all these considerations, and resolving all factual disputes presented by

23  the evidence in the light most favorable to Plaintiff, the Court finds no triable issues of fact exist

24  to support Plaintiff's claim that Officers Ruiz and Jordan's use of force under the totality of the

25  circumstances presented to them was anything other than objectively reasonable.  *See Scott*, 39

26  F.3d at 914-15 (finding defendant officers' use of force was objectively reasonable as a matter

27  of law where plaintiff "held a 'long gun' and pointed it at them."); *Forrett*, 112 F.3d at 418-21

28  (finding officers did not violate the Fourth Amendment, and thus were entitled to summary

judgment where they shot a residential burglary suspect who had previously shot a hostage, and who "eluded capture for almost an hour by running across yards and streets, and jumping fences," but was unarmed when apprehended); *Blanford*, 406 F.3d at 1115-1118 (finding deputies used objectively reasonable force as a matter of law where plaintiff was wearing a ski mask, acting erratically, and carrying a sword through a suburban neighborhood, but refused to give up his weapon and "manifested a continuing intent to evade their authority.").

Accordingly, the Court GRANTS Defendant Ruiz and Jordan's Motion for Summary Judgment as to Plaintiff's excessive force claims.  And because it has found no Fourth Amendment violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

**D.  Whether any evidence in the record supports a "*Monell*" claim against the City**

Finally, the sole remaining Defendant, the City of San Diego, seeks summary judgment as to Plaintiff's allegation that the "San Diego Police Department should have reasonably known that the officer [i]nvolved in this civil action engaged in numerous constitutional violations that caused [him] physical and life altering emotional scars."  (Compl. at 5).

A plaintiff properly alleges a § 1983 action against a local government entity only if "the action that is alleged to be unconstitutional implement[ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," *Monell v. Dep't of Soc. Servs. of New York.*, 436 U.S. 658, 690 (1978), or "the city made a 'deliberate' or 'conscious' choice to fail to train its employees adequately."  *Mackinney v. Nielsen*, 69 F.3d 1002, 1010 (9th Cir. 1995); *Orin v. Barclay,* 272 F.3d 1207, 1216  (9th Cir. 2001).  Plaintiff makes no allegations to show and has pointed to no evidence in the record which  supports the existence of any City of San Diego custom, policy or practice in this case, although Defendants do claim their use of force was "within San Diego Police Department's Procedures for Use of Force."  Defs.' P&As in Supp. of Mot. for Summ. J. at 14.

However, "while the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights." *Scott*, 39 F.3d at 916; *see also Villegas v. Gilroy Garlic Festival*, 541 F.3d 950, 957 (9th Cir. 2008) (en banc) (If "there is no

constitutional violation, there can be no municipal liability.").  Thus, as was true in *Scott*, the City in this case "cannot be held liable because no constitutional violation occurred," 39 F.3d at 916, and whether "the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (emphasis omitted); *see also Long*, 511 F.3d at 907.

For these reasons, the Court also GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's claims against the City.

## IV.    Conclusion and Order

Accordingly, Defendants' Motion for Summary Judgment [ECF Doc. No. 65] is GRANTED.   The Clerk of Court is further DIRECTED to enter a judgment in favor of Defendants and to close the case.

**IT IS SO ORDERED**.

DATED: April 3, 2013                    _____
**HON. IRMA E. GONZALEZ**
United States District Judge